4. Mr. Albee, Ms. Miller, and Mr. Schwartz 5. Mr. Albee, you may start. You need to unmute. Thank you. May it please the court. After months of escalating and increasingly violent and humiliating abuse, Aaron Stanley took it up a notch. On top of the strangulation and the vicious beatings, he got himself a gun and he used it. He used it to shoot the guy. Mr. Albee, I'd like to ask you a question. And for the purposes of answering all my questions, I want you to assume that I accept every fact in your plaintiff's statement. The government makes it, it seems to me, to make a big deal about the fact that it's unsworn. I don't accept that. Just accept the facts as stated in the statement. But on page 45 of your brief, you write, Marjorie knew that it would follow, meaning a severe beating would follow, as soon as she returned to Stanley without the money. So I want you to assume the following facts. If there are particular documents in a building and a building owner had to get those documents under, he wanted to present a defense defense, so someone held a gun to his head and said, I'm going to shoot you if you do not get the documents from the building. You got to get those documents from the building or I'm going to shoot you. So there's imminent harm if he doesn't get the documents from the building. And he burns the building to the ground. He commits arson. And then he says, well, I was under duress. I had to burn the building to the ground in order to obtain the documents from the building. He wouldn't be able to submit a duress defense under those circumstances. Would you agree with that? I have to say, I'm a little uncertain. Let me tell you exactly where I'm going. I don't, I'd like you to point to me the facts in the statement, particularly with respects to robberies two and three. It seems to me that this was about getting the money, not about committing armed robbery. I'm not sure that where your client Marjorie says she would be subject to a severe beating unless she committed armed robbery. It seems to me that your argument is she would be, she would be subject to a severe beating unless she obtained money. And I think it's, I think it's, I think it's both. On the, on the night, on the night before the robberies began, he pistol whipped her in the eye socket with a gun in connection with it, with demanding that she get money. The very next day he takes her to the stop and go, puts a gun in her hand and tells her she needs to go inside. She's been around him enough. That's robbery number one, right? Okay. And judge, I think, I think we cannot look at any of these robberies in isolation without looking at the history of abuse and what's happened before. And so she knows from robbery number one that he's put the gun in her hand. He's told her to do the robbery and she greatly fears what would happen if she didn't follow his very command right then and there to do to do that. Can I, can I jump in with that? Because I think a lot of what we're trying to sort out here goes to the difference between subjective factors and objective factors that pertain to a certain population of people. So in a sense, I want to draw an analogy to what I understand your argument to be, that she isn't just on a spot market transaction deciding whether to do this robbery or not. She's been groomed, as we see in some of the pornography cases, as we see in other cases, to a certain point. And I gather that you're saying that this evidence comes in to figure out what a reasonable person with the same grooming that went on would have done. Is that right? It is, Your Honor. And I, I think that that ties into Judge Kirsch's question and where I was going is, is she's also, she's hyper vigilant to the cues of impending danger. And so she knows Aaron Stanley well enough that he doesn't have to articulate what he wants. She knows what he wants and she knows the consequences of not doing what he wants. But this would be a different case if there were no history, right? Yes. I mean, if it were just the guy who's standing in front of the building saying, I have a gun to your head, go in and get the papers and, and they, they don't have a history, you wouldn't be arguing, I assume, duress if the guy burns the building down or breaks into an apartment and grabs the papers or does some other crime. Correct. As, as you said, he, she's been, she's been groomed for months on this. I mean, one of the, presumably one of the purposes of Aaron Stanley's abuse is so that he gets this kind of control so that she doesn't believe that she has options. And so it is an entirely different situation than it might've been on day one or two of the relationship after going through this for months. Can you give me other examples of applications of objective tests where we, where we define the set of people whose actions we're assessing in the way you want us to do here? I mean, I, I think as a general matter, it applies in self-defense, in self-defense cases. I mean, we, we look, we put ourselves in the defendant's shoes and what they, what they, what they believe and what they've been exposed to and ask what's, what's the reasonable response given what their, what their situation is. And I think it's, I think it's the same. I think it's the same here. Her situation is one who's, she's been groomed and beaten for so long that she doesn't feel like she has other avenues and that she knows that the danger is immediate because when he comes home and she doesn't have the money and hasn't committed that robbery, she's going to get a beating. And these have escalated so much and he now has a gun that she has every bit. She, she fears for her life and, and reasonably so. What we know from long experience with battering and its effects is that these aren't empty threats. These are, these are real threats. You know, we have some data about if a woman's been strangled before, what are extra risks are for leaving the relationship, what the risks are of calling the police when there's been threatened threats to not call the police. We know that that all escalates the danger to her life and puts her life in severe jeopardy. And his recent conduct has escalated to such a point that she has to fear the end is, the pistol whipping to the face. So let me, let me follow up on another aspect I think of what Judge Kirsch was, was getting at. And I want to focus now on the second robbery, not the first one. He's certainly forcing her to do something. He is, he's made up this idea that she owes him money. So she knows she's got to get money. And she's telling him around the time of the second robbery, I mean, they're just day, day, day, that maybe her mother will give her the money. What reason is there to think vis-a-vis the second robbery that he cares, whether she gets it through robbing the, the orange, whatever it was, you know, store, or she gets it from her mother, or she sits out there with a tin cup all day and collects it. Why does he care? Well, I, I don't, you know, I can't see into his mind as to what he, what he cares about. But I think, I think she's aware that if that money doesn't show up, she's, she's in grave danger. But do you coerce her to commit the second robbery? And if the second robbery is different from the first and third, what does that do to your theory of relief? He's, he's, he's aware. I mean, even from the, even from the text, he says, unless you're lying, he, he, he knows that he's being, he's, you know, I think he knows that he's being put off with a lie about getting money from the mother. And that he is, he is instilled in the recent weeks that robbery is what you're going to have to do to get the money, because I'm not putting up with not getting the money. And so she sees, he's a ticking time bomb. She sees that timer going down as the day goes on and the threats through the text and conversations get worse and worse to the point where she says, why don't you just kill me? She, she's, she's at, at more than wit's end. Her life is absolutely in danger at that point. Mr. Albee, I gather that you're arguing for a rule that would be limited to abuse by an a loan shark. A loan shark doesn't care where the money comes from. But somebody who robs to pay a loan shark to avoid a beating with that, would that be subject to the defense you're talking about here? No, I mean, for several reasons. I, one is, I think the case loss talks about if, if it's a situation, the person put themselves in, they may not be able to take advantage of the duress, duress defense in those, in those kinds of instances. And, and there, there wouldn't be the same response through expert testimony about not having other reasonable options in those kinds of, in those kinds of cases. What about, what about prison cases? What are, in your brief and your reply brief on page 22, you say drug and prison cases are different from domestic violence situations. In the drug cases, the person is usually put themselves in the scenario or quickly dropped into it. The law demands if they can, they must extradite themselves. There's nothing about prison cases. How do we distinguish between prison cases? Well, the, the, the two prison cases that are, that are briefed by the parties here, in each of them, there wasn't a specific, a specific threat. You know, I, there might be a prison case where it's a cellmate who's armed at that moment, but the, the, the prison cases that, that have been before. She doesn't, your, your client doesn't allege a specific threat. She says it's there and expert witness testimony would explain why it was there. Surely in a prison context, a prisoner could call an expert and say it wasn't an explicit threat, but boy, there's a lot of beatings that go on in prisons and other very bad things. They could put on, I think the same testimony that your client could with respect to battering and its effects. Well, there is a, there, there's not an articulated threat here, but there's a very specific threat. She has been beaten virtually every day for months and it's anytime she does not comply with his, his demands. And so she knows when he gets home and she hasn't met the demand for, for money to commit this robbery, that there is going to be a beating. I think it's a very specific threat in the, in the prison cases. It was just, there was just racial tension in the prison that made people uneasy, but there was no, in one case there was no, no specific threat towards the defendant and the other one, it was just a rumor that the defendant might be targeted. So those have been very different kinds of cases. And, and, and the court also said, we are going to carve out a, I didn't say we'll carve out an exception, but they said we treat prison cases different. What do we do about the imminency requirement here? Do we determine, and look, I take it your argument is that there was, there was a, there was a particular fear of imminent violence every minute of her life. If she, if she, if she was to unload the dishwasher and she did it in a manner in which he didn't agree with, she could be subject to severe abuse. At least that's the way I read the statement. And again, I'm not disputing the facts. Yeah. I mean, I think as to these robberies, we are alleging something much more specific. When he gets home, if she doesn't have, if she doesn't have the money and he has already communicated that you rob, if you don't otherwise have the money, if she doesn't have it, she's taken a beat. Her life is in jeopardy at that moment. I think it's a very specific, specific threat under these circumstances in the way she's been groomed and conditioned. Mr. Albee, can I ask you about the thing that concerns me here is the, the prong about having no reasonable opportunity to refuse to commit the offense. Um, and I, I think I understand your arguments here, but, um, I'm trying to see how that plays out. For example, um, in, I guess my question is whether proportionality comes into play here. Hypothetical suppose the instruction from Stanley before the first robbery is take the money and then shoot the robber. Um, does the defense still work? Yeah, I, I, I would agree there is proportionality and that that goes into the reasonableness, reasonableness of the, and I also, and I would just say that I'm, I'm a little, that's, that's the prospect that troubles me about the reliance on the strict, uh, on just saying the same rules that apply to self defense should apply to this. Um, simply because we're talking about violence or threats of violence directed at innocent third parties. So do we need to distinguish Mr. Albee between the evidence that you want to see introduced to inform the jury's determination about whether there's enough coercion or the instruction that would go to the jury saying under these circumstances, you know, you know, maybe slapped her across the face a few times, but that, that was all, or maybe, maybe there was this level of violence, but he was demanding that she go out and murder three people or one person or something. So I see a difference between the evidence that gets admitted and evidence that would be sufficient to make out the defense. Is that fair? Yeah, it is. If I understand the courts, the court's question, I mean, we're, we're just looking to establish the basis to provide the defense to the, to the jury. And I think we've got a role. It may well be that the answer to my proportionality question is put it in the instruction. Yeah, I would think. All right. Well, I think your time has run out, Mr. Albee. So let's turn to Ms. Miller. May it please the court, attorney Amy Miller on behalf of the amici and domestic abuse, Wisconsin and Wisconsin coalition against sexual assault, arguing in support of the appellant Marjorie Dingwall. Duress is a common law defense and two features of the common law are particularly relevant to this court's analysis of the duress defense in this case. First, the common law treated self-defense and duress as the same species of defense. Indeed, in his commentaries, Blackstone talks about the two defenses in the same paragraph and treats them as the same defense simply applied to different circumstances. And the elements of the two defenses are the same, a reasonable belief of imminent great alternatives. There is thus no reason to treat the defenses differently, and the common law supports treating them identically. As now, Justice Kavanaugh noted in his opinion in the way it is now nearly universally accepted across all jurisdictions that evidence of battery and its effects is relevant to self-defense. This kind of evidence can explain why a victim of domestic abuse may reasonably fear imminent great bodily harm or death and may reasonably feel that she has no alternative but to kill her abuser, even when her abuser is not presently attacking her. This includes times when the abuser is in another room, watching TV, or even asleep. These same principles apply to the identical defense of duress. Evidence of battery and its effects can be relevant to explain why it may be reasonable for a victim of domestic abuse to feel that she has no option but to commit the crime charged and that if she does not commit the crime, she faces imminent great bodily harm or death, even when her abuser is not physically present during the commission of the crime. Does it matter whether the victim of the victim of abuse's crime is the abuser or a third party? As a general matter, it doesn't matter. The common law did distinguish between crimes against law and crimes against nature. For example, a murder. Self-defense would justify a murder where perhaps duress would not. Here, of course, that is not an issue. These are robberies. These were not murders. They weren't murders, but we see time and time again victims of robberies where no violence is inflicted are still traumatized. That's correct. And this issue of the innocent third party as kind of the difference between self-defense and duress was raised in Noy and now Justice Kavanaugh addressed that issue saying that if there is some sort of problem posed by the fact that duress involves a third party, that should be addressed by the instructions or by changing the way we view the two defenses rather than by ad hoc evidentiary determinations about what kind of evidence can support the defense. The second feature of the common law that is relevant to this court's analysis is that the common law presumed that women under the control of men acted under duress whenever they committed a crime in the husband's presence. So this part of your argument I found a little discomfiting since, you know, I hate to return to the law of coverture for all sorts of reasons, but isn't even the academic literature on the reactions of persons who have been subjected to this kind of horrific abuse, at this point it's gender neutral. I mean, there can be male victims of this sort of thing about which you would say the same thing. So isn't the most you can say that the common law realized that, you know, person A might be so much under the control of person B that agency has been lost? That is very much correct, Your Honor. Yes, we're not arguing that coverture applies here or that this will apply to women. Or anywhere, I hope. Right. Yes, yes. Hopefully it has been entirely abandoned. But the point is that the same coercive forces that were placed upon the woman in coverture act upon the victim of domestic abuse, whether it be a woman or a man. The same kind of control over the finances, control of the social life and the physical beatings still apply. And so because the common law accounted for those coercive forces, so too should modern law account for those coercive forces. Thank you, Your Honors. All right. Thank you very much. Mr. Schwartz. Can you hear me? Yes, thank you. Good morning, and may it please the Court. There is no dispute that Appellant suffered months of significant abuse at the hands of Erin Stanley. And there is also no dispute that it was appropriate for the District Court to consider that history of abuse in exercising its discretion at sentencing. In this appeal, however, Appellant seeks something far more radical than mitigation. Appellant asks this Court to permit her history of abuse to serve as a complete excuse for a commission of three armed robberies. Well, only in the sense that Appellant is saying that that should be submitted to the jury, and if the jury thought appropriately instructed that this met the elements of the duress defense. Appellant's not asking for the creation of a duress defense. There is one, but the Appellant is asking that this evidence be in there. So I want to ask you whether you, whether the government's position is that it's just impossible that abuse of this type could render a person powerless to oppose the views or the demands of the abuser, or whether you just think this evidence somehow doesn't make the cut. We think that the Court should affirm the traditional distinction between objective factors and subjective factors. But the point is we're trying to probe that, because I'm reminded of what Justice O'Connor said in the Casey case, where the Supreme Court was considering whether there could be a spousal consent requirement for abortions. And what the Court said in that case was, we don't look at the entire pool of married people, because for a great many women, they have wonderful relationships with their husbands. This is not a very difficult burden, and it would not be an undue burden. But it said we need to look at the subset of people for whom this is a real constraint. And following that line of reasoning, when we apply the objective test, don't we look at a subset of people who are abused somehow? Not all of them are going to be abused enough, but maybe some of them are. I think the question turns on whether we're looking at that abuse as informational history about the abuser, or whether we're looking at it for its psychological implications or on its psychological impact on the individual defendant. On a reasonable person, on anybody, not necessarily on this person, but on a reasonable person. Do you remember this Court's decision in the United States against Kalymlym, by any chance? Not off the top of my head, I'm sorry. That was a case in which it was actually a prosecution of two people in Wisconsin who had imprisoned their maid from the Philippines. And they wouldn't let her out of the house, and they forced her to lie down on the floor of the car. When she went to church, they changed churches every day. And she was alone in the house a lot with the children. But she was so controlled by those people that she isn't found in the house until one of the children finally tips off the police, and they find her cowering at the back of a closet. And it seems to me quite reasonable to say that the psychological abuse that she suffered rendered her unable to just walk out the door of the house and go to the police office, which would have been entirely appropriate given the kind of treatment she was getting. And I understand what is being presented here to be much the same. There can be psychological abuse as well as, of course, physical abuse that is so extreme that even though in the moment the person theoretically could, Ms. Dingwall could have gone up to the clerk at the store and said, I'm in trouble. Please call the police. Rescue me. She could. She actually, as a psychological matter, couldn't. So once we're talking with that level of extrema, I think we have other buckets that can take care of, other doctrines that can take care of such kind of psychological impacts that we have. You know, every defendant needs to form the proper mens rea. There's not guilty by means of insanity. But she had the mens rea to drop. Go ahead. Right. So I think in a case where somebody has the mens rea and, you know, is mentally capable, then we have to apply the traditional law of duress. Duress is an extraordinary defense. Mentally capable to what? I'm postulating, just like Ms. Kalimlian, sorry, just like the maid in Kalimlian, Dr. Kalimlian, she actually cannot walk out of the house herself. She is psychologically a prisoner. So I think we have to look at a distinction between a kind of internal mental processes and if you're some kind of a neurobiological arguments, right? But there was nothing present. Why? There was no. Because there's, because psychological coercion doesn't exist? No, because once we are looking, once we're using a reasonable person standard, it has to look at a reasonable person. It becomes less clear to me.  standards. I'm not suggesting that we should. But what I'm concerned about is just this whole concept that we have to look at the entire population of the United States when we decide what a reasonable person would do instead of the relevant subset. You know, we look at the subset of people in wheelchairs when we worry about ramps. We don't worry about people who are perfectly able to walk. It's very common that we look at subsets of people. And you might say the subset of people who have been beaten every day for the last six months isn't going to look the same as people who are fortunate enough not to be in that situation. You're not asking what any individual is thinking. You're just saying they're differently situated and need to be assessed separately. So what we're looking at is, I think the key question is when we're defining that category, are we defining that category with respect to the knowledge they've had about those previous experiences? So they know about what this abuser is capable of. They know what their situation is in general. Or are you looking at the psychological imprint that those past experiences had on the person in their mind? And that's what we can't consider. For sure, we should consider the knowledge that such a person had in her situation. So Mr. Schwartz, could you consider the fact that, let's say, somebody has a bipolar disorder in evaluating their response to this kind of stress? So insofar as it affects their perception of the realities in front of them, perhaps, but insofar as it's about the internal mental processing, the kind of evaluation internally, that's where the line needs to be drawn. I don't understand the line. So we offered the example of colorblindness, where that's something. Yeah. Colorblindness can be physically measured, but why not mental illness? Mental illness, again, aside from reason of, aside from other legal doctrines that get you out of- In evaluating the reasonableness, in evaluating the situation and the person's response to it. Frankly, the boundary between objective and subjective here seems very, very slippery to me. So I think that's correct. And so there are going to be some gray lines, but we can't just allow previous experience and their psychological impact to destroy the distinction between objective and subjective. If you go down that route, the veteran comes back from a war and has PTSD, right? And or the child who grows up in an overbearing family or experienced childhood abuse, they're going to, there are claims that, oh, my will to resist was lesser than your average person. But the reasonable person center is meant to capture what a reasonable person, again, with the available information, with the available circumstances. And that's why every circuit to have considered this has drawn that distinction between psychological and objective external factors. You know, the D.C. Circuit made that distinction in Noyer. The Sixth Circuit made that distinction. Dan Lopez made that distinction. Dixon in the Tenth Circuit made that distinction. I'm not aware of any court that has said, oh, we allowed subjective internal mental processes. Nobody's saying, nobody's ready to say that. I just, I'm not sure how distinct this boundary is. But let me ask you if I could also about the case of United States against Young. As I understand it, in that case, the victim of abuse had behaved in ways that seemed irrational. She recanted her charges of abuse. She tried to exonerate the defendant. And where the victim of that victim of abuse was behaving in ways that may have seemed unreasonable to a jury. If, in fact, the government's case was convincing, the government was allowed to offer expert testimony to explain her behavior, right? Correct. Yes. So if it's OK for the government to offer that kind of evidence, why is it not similarly fair to let the defense offer similar evidence to explain why this defendant might not have taken apparently rational steps like refusing to commit the robberies or aborting the robbery by asking the clerk to call the police? So I want to be very clear about this. We have no opposition to bringing in evidence of battering and its effects and expert testimony about that for that kind of determination. There, the question was about establishing or rehabilitating the witness's credibility. A jury interacting with that witness might say, oh, we don't really believe that witness was abused because why didn't the witness leave? And so an expert can come in and explain that often women who are abused stay in those relationships. And so it's about rehabilitating the credibility of the witness, right? Explaining why a woman wouldn't behave the way a jury might expect the woman to behave. But that's a form of behavior that you're trying to explain. This behavior, why did you stay with the abuser? Similarly, it's a form of behavior that she's trying to say, you know, I was compelled to do this. It wasn't my free will doing it. And I had no way of, I had lost the emotional or psychological wherewithal to walk away. And the jury might buy it or the jury might not. Just as in Young, the jury might say, yeah, you know, abuse victims often recant. But frankly, you know, we don't, we're not persuaded this time. It's the same pattern. Well, no, what is the question of credibility, which is a jury determination about whether the defense, whether the witness is in fact telling the truth, whereas the question that they want to. They're both here, but they're both, they both involve, in essence, attacks on behavior that would seem, we would say, in essence, irrational or difficult to explain for folks who have not been in that situation. But in one case, in Young, they're trying to explain and trying to establish that the witness is in fact telling the truth. Here, we take everything in appellant statements as true, and the judge took it all as true below. The question is whether taken as true, that rises to the legal determination of reasonableness, right? Isn't there an empirical question embedded in there that the expert testimony would have paralysis is even possible? You know, I mean, we've had situations where this has been litigated one way or the other. You know, veterans coming back from the Vietnam War allege that exposure to Agent Orange did certain things to their mental capacities, and we didn't compare them to people who'd never stepped foot in Southeast Asia. We compared them to comparable veterans and did scientific studies about Agent Orange. The same thing is true here. Is this the kind of thing that causes somebody to lose the ability to act independently? So again, I don't know if any of those cases were duress cases, and that might be relevant here, but the question is reasonable. I'm trying to phrase it more generally. I'm just trying to say, you know, is this a real thing? You know, if somebody said, you know, I ate yogurt for lunch, and now I have, you know, gone into a brain fog, somebody might say, wait a minute. You know, yogurt doesn't cause brain fogs, at least as far as I know it doesn't. But the expert testimony would say there is a syndrome. There is an objective thing out there. Whether this woman meets it is for the jury to decide, but it's an objective fact. It's a syndrome. So I would direct the court's attention to the actual expert report that Appellant submitted. There's nothing in there saying that Appellant was completely incapable. It talks about diminished capability, talking about averages. There's no kind of verbal evidence. Right, and so the jury might have thought, the jury had this evidence come in, the jury might have thought, well, she hasn't done enough to convince us that there was duress. I'm sure the government would have argued that. There's the prior legal question of whether there were no reasonable alternatives and whether the specific threat was immediate. Reasonable to whom, though? Reasonable to you or me? Or reasonable to somebody who had been beaten every day by a domestic partner? I think the inquiry is reasonable to the run-of-the-mill average person knowing about every detail of those facts. That's what I'm trying to contest. That's what I'm concerned about. Mr. Schwartz, can I ask you a question? On page 14 of the Appellant's brief, they sent a series of text messages which occurred days or weeks before the robberies. And these text messages are between Marjorie and Stanley's mother. And the text messages clearly talk about what is occurring here. Aaron is going crazy. He's beating me up, trying to kick me and Bea out of the house. He shot his gun into the mattress, and I'm scared. I left the apartment when he went to the store. Thank you. I think I should go to the police station and file a restraining order against him, et cetera. And then she says, I want my Aaron's back, so I'm so torn. I'm just heartbroken. What is the district judge to make of this, particularly when it comes to the second prong of the duress defense, which is no reasonable alternatives? Is the district judge just supposed to say, well, in this case or in all cases where a defendant alleges battering, we're going to allow expert testimony in to inform the jury as to the effects of battering. And then the trial is going to become about that rather than the elements of proof that the government must meet beyond a reasonable doubt to get a conviction for armed robbery. So I guess what I'm saying is, if the evidence came in in this case, where would the guide be for a district judge to exclude certain evidence? Or does it all just come in in duress cases, I guess, including prison cases? I want to be clear. We're at a prior question, not talking about admissibility of evidence under Daubert, et cetera. We're talking about the prior question of whether defendants even proffered sufficient evidence such that a jury could find by a preponderance with the burden on defendants could establish this defense, right? So this is a defendant's defense that she has to proffer. And so at a later stage, there would be a termination of after Daubert, et cetera, about precisely which kinds of evidence could come in. What more do you think would have been necessary in this proffer to let it come in? I'm not sure, because you're saying some things that make me curious why it didn't just come in. There was no specific threat that was imminent to the actual commission of the crime, and there were reasonable alternatives. When an appellant walked into the store to commit these robberies, for two of them, Aaron Stanley was nowhere in the vicinity. For the first, he was down the block in the car while she had the gun. So under this court's cases, in cases like Josek, where a defendant is sitting in a car outside, and his alleged coercer is inside with the gun, and there's only a minute or two where he's sitting in the car, this court held that he should have run 55 feet, and asked a passerby for help. That's exactly the kind of thing that appellant could have done here. So even though we know that she can't do it, we will have the fiction that she could? That she's psychologically unable to do it. That would be the accepting all of the facts in her personal statement as true. Obviously, they're contestable, but if we accept them as true, you're saying that we should adopt the legal fiction, that even though she can't do it, we're going to assume she could. So I don't think that a defendant's statement that I was psychologically incapable of doing. In fact, in Josek, the defendant described himself as paralyzed by fear, and this court said that was insufficient. So we think this is analogous to that. Now, again, if there was an expert who came in with neurobiological evidence establishing some new principle of science, that in fact, the person in this case, in this defendant's situation, was physically and physiologically incapable of doing something, that would be totally different. That would be a very different case. That wasn't the expert evidence that was submitted in this case. No, no, I mean, and you're essentially saying, unless it's physical, we don't care. Unless it's physical, it's not real. I'm not saying it's not real. Unless it's physical, it can't be part of the reasonable person analysis. That's what we're saying. That under the- Reasonable people don't have psychological conditions, such as, you know, bipolarism, or Tourette syndrome, or other kinds of psychological injuries. Well, insofar as the effect- You're saying psychology actually isn't real. That's the governor's position, as I hear it. That's not what I'm trying to say. What I'm trying to say is that the objectively reasonable person standard is a universal standard, is an abstract standard that's meant to capture specific, observable facts about the circumstances and situation, but that once you allow internal mental processing, there's a long, slippery slope here. And I think the other thing we would say is that is that duress is defined under the Supreme Court's precedent in Dixon by what Congress would have understood the common law of duress to be at the time of the individual federal statutes passed, or in the 1940s and the 1960s. And so this court shouldn't go about expanding a duress claim because it's still a function of statutory interpretation. Under Dixon, this court is looking to what Congress would have assumed to be the law of duress. So is your theory then that the availability of this defense varies depending on the decade of the statute in which the particular criminal statute was passed? So that, for example, a statute passed in 2010, where the notion of the battered woman syndrome, or where this is pretty well established, that would be acceptable, but not if we're going back to, let's say, early 20th century criminal statutes. Is that where we want to go? So I'm not sure the court has to directly address that, but the Supreme Court's doctrine in Dixon does suggest that. It says that Congress legislates against the backdrop and that it's a function of statutory interpretation to define the extent of a duress defense. So let me just, if I could, with the indulgence of my colleagues, just one more quick question. Is it your theory then, the government's theory, that with or without the expert testimony, Ms. Dingwall could not be allowed to testify about the history of abuse attributing her conduct to that in a trial as to guilt or innocence on robberies? No, if in fact the defendant had met her burden of proffering sufficient evidence to go to a trial, then lots of this evidence would come in with respect to duress. But defendant actually has to at least meet a... I think we're going in circles here. All right. Thank you very much, Mr. Schwartz. All right. Thank you, Mr. Schwartz. And I think your time had run out, Mr. Albee, but we'll give you one more minute. And you're muted again. Two points very, very quickly. The government just referred to Jokic. That case actually was a bench trial in which the district court considered duress and rejected it just as we're asking this case to be presented to a jury. They might agree with us, they might not. But that's what happened in Jokic is the sufficiency of the evidence case. Did the defendant in this case ask for a bench trial, by the way? No, no, no. We wanted it submitted to a jury and we thought we had some evidence that would support that submission. The government began its presentation by suggesting that we're asking for some radical new rule. As the court recognized in Inouye and in Lopez, most courts that have addressed the question of whether battered women syndrome evidence comes in in a duress case have found that it does. And based on those cases, we'd ask the court to vacate the conviction and remand to the district court. All right. Thank you very much. Thanks to all counsel. And the court will take the case under.